# In the United States Court of Federal Claims

No. 09-147 C
(Filed: May 27, 2010)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| KEMRON ENVIRONMENTAL<br>SERVICES, INC., | \* |
| | \* |
| Plaintiff, | \* |
| | \* |
| v. | \* |
| | \* |
| THE UNITED STATES, | \* |
| | \* |
| Defendant. | \* |

Subject matter jurisdiction; RCFC 12(b)(1);
Contract Disputes Act of 1978, 41 U.S.C.
§§ 601-613; Performance Evaluation;
Nonmonetary Relief; Definition of "Claim";
Failure to Submit "Claim" to Contracting
Officer; <u>BLR Group of America, Inc.</u>;
<u>Record Steel & Construction, Inc.</u>; <u>Todd
Construction, L.P.</u>; <u>Neal & Co.</u>

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>Richard Paul Rector</u>, Washington, DC, for plaintiff.  <u>Samuel B. Knowles</u>, of counsel.

<u>Matthew H. Solomon</u>, United States Department of Justice, Washington, DC, for defendant.
<u>Stanley E. Tracey</u>, United States Army Corps of Engineers, Omaha, NE, of counsel.

## OPINION AND ORDER

**SWEENEY**, Judge

Before the court is defendant's motion to dismiss plaintiff's complaint pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC").[1]  In this case, plaintiff alleges that government personnel prepared and issued an unfair, inaccurate, and unreasonable evaluation of its performance under a contract for environmental remediation services.  Plaintiff requests that the court declare the evaluation at issue to be false and highly prejudicial, and direct that the evaluation be rescinded or revised.  Contending that the court lacks jurisdiction over plaintiff's allegations, defendant argues that plaintiff fails to assert a cognizable claim under the Contract Disputes Act of 1978 ("CDA"), 41 U.S.C. §§ 601-613 (2006).  For the reasons discussed below, the court grants defendant's motion.

---

[1]  Alternatively, defendant moves, pursuant to RCFC 12(b)(6), to dismiss the complaint for failure to state a claim upon which relief can be granted.

# I. FACTUAL BACKGROUND[2]

## A. Solicitation and Award

In 1994, the United States Army Corps of Engineers ("Corps"), Omaha District, began monitoring and conducting soil and groundwater tests at the abandoned Lincoln Air Force Atlas Missile Site 10 ("Atlas Missile Site 10") located in York, Nebraska. Compl. ¶ 7. The general purpose of this testing was to ascertain the extent of environmental contamination. Id. Key objectives of the testing were "to define, or delineate, the plume of groundwater contamination, to identify any continuing sources of contamination, if any, and to recommend available alternatives for remediation or site clean-up." Id. ¶ 8. In December 2002, the Corps compiled the results of its testing and issued a report, "Remedial Investigation/Feasibility Study, Defense Environmental Restoration Program (DERP), Formerly Used Defense Site (FUDS), DERP Project No. B07NE009801" ("Feasibility Study"). Id. ¶ 9. The Corps issued an addendum to the Feasibility Study, "Draft Supplemental Remedial Investigation/Feasibility Study, and Hydrogen Release Compound Pilot Study" ("Draft Supplemental Feasibility Study"), in September 2003. Id.

In March 2003, the Corps issued a solicitation for up to three fixed-price, indefinite delivery/indefinite quantity ("ID/IQ") multiple award remediation contracts on a small business set-aside competitive basis. Id. ¶ 15; accord Def.'s App. at A2. The contracts were "for a wide range of environmental remediation services, including incidental construction and incidental engineering services, at various known or suspected Environmental Remediation . . . sites, in order to achieve the primary objective at most sites–regulatory closure,"[3] Def.'s App. at A5, and had base periods of three years with one two-year option period, id. at A6. The Corps anticipated that individual, firm-fixed-price task orders would be issued under each contract. Id. at A5. In July 2003, the Corps awarded to Kemron Environmental Services, Inc. ("Kemron"), a New York corporation and small business concern headquartered in Virginia, contract W9128F-04-D-0019,

---

[2] The facts are derived from the complaint ("Compl."), an appendix with two, consecutively paginated exhibits included with the government's motion ("Def.'s App."), and exhibits appended to plaintiff's opposition to the government's motion ("Pl.'s Ex.").

[3] The "Description/Specs/Work Statement" indicated that the contractor would perform, among other things, "site investigations/characterizations, studies, evaluations, incidental designs, incidental construction, and remediation of contaminated sites." Def.'s App. at A5. It also required that the contractor provide investigative services that included, but were not limited to, "performing field activities to determine the geology, groundwater conditions, contaminant concentration, contaminate migration, installation of monitoring wells or other monitoring devices, sampling, chemical testing and foundation characteristics . . . ." Id. at A8.

one of the three ID/IQ remediation contracts.[4]  Compl. ¶¶ 3, 15; <u>see also</u> Def.'s App. at A1-86 (containing the Kemron contract).

On March 10, 2004, the Corps issued a notice of intent to award Task Order 0001 ("Task Order 1"), a fixed-price remediation with insurance task order concerning Atlas Missile Site 10, to one of the three small businesses selected under the ID/IQ competition.  Compl. ¶ 16.  Task Order 1 was a performance-based contract that focused upon end results, rather than upon specific methods.  <u>Id.</u> ¶ 19.  The task order's performance work statement

> contemplated that the contractor would expend initial effort in assessing the site conditions, followed by the submittal of its work plan to the government for review and approval.  Once the government had approved the proposed work plan, the contractor was to proceed accordingly, the final objective being the attainment of "Response Complete" and "Site Closure" by the end of the contract's period of performance on September 12, 2009.[5]

<u>Id.</u> ¶ 20 (footnote added).  The Draft Supplemental Feasibility Study, which was used, in part, to define the requirements of the task order solicitation, "described the site conditions in detail so that prospective offerors could develop the most suitable solutions and price them accordingly." <u>Id.</u> ¶ 10.  Specifically, it reported that a plume of trichloroethylene ("TCE") contaminant extended beyond the eastern property boundary a minimum of 2,300 feet and a maximum of 3,003 feet.[6]  <u>Id.</u> ¶ 12.  Additionally, the Draft Supplemental Feasibility Study indicated that "groundwater was the only medium of concern . . . and that vadose zone soil contamination was

---

[4]  The ID/IQ contract identified Douglas E. Hadley as the contracting officer.  Def.'s App. at A1.

[5]  "Response Complete" is a term of art used in environmental remediation and is achieved "when the site is restored to a condition such that no additional remediation is needed." Compl. ¶ 20.

[6]  The Draft Supplemental Feasibility Study stated:

[S]ite groundwater analytical results and the configuration of the dissolved phase TCE contaminant plume . . . indicate that dissolved phase TCE in the groundwater has extended through the relatively transmissive sands of the Grand Island Formation east-southeast, beyond the eastern property boundary, a minimum of 2,300 ft . . . and a maximum 3,003 ft . . . .  The iso-concentration contours traverse the site in response to the contaminant source area and potential groundwater migration over an approximate 40-year period since the site was deactivated.

Pl.'s Ex. 1 at A2.

not identified in the source area."[7]  Id.  Kemron relied upon this information when it developed its fixed-price offer, id., having allocated approximately $100,000 toward its site assessment "with the understanding that, for the most part, it would be validating ten years of site analysis work" conducted by the Corps, id. ¶ 22.

The Corps awarded Task Order 1 to Kemron on June 30, 2004.[8]  Id. ¶ 17.  According to Kemron, this task order award "was based on the mutual understanding that the site conditions were generally consistent" with those described in the Draft Supplemental Feasibility Study.  Id. ¶ 21.  Task Order 1 had a base value of $4,260,075, with an option valued at $821,407, id. ¶ 17, and imposed a deadline of September 30, 2009, for achieving "Response Complete" status, id. ¶ 24; accord Pl.'s Ex. 2 at A9.  The Task Order 1 base price included a $613,159 insurance premium for a policy with American International Group, Inc. ("AIG") that provided for protection against contract overruns.  Compl. ¶ 18.  Pursuant to the policy, AIG would cover eighty percent of cost overruns beginning after actual costs incurred reached $5,853,852.  Id.  The aggregate limit of the policy was $5,468,322.  Id.  Furthermore, the policy required that AIG approve in advance any modifications to the contract's remedial plan.  Id.  The insurance coverage period of the policy extended through July 6, 2014.  Id. ¶ 25.

### B.  Kemron's Performance of Task Order 1

Kemron commenced its assessment of Atlas Missile Site 10.  After one year of work and expenses exceeding $1,000,000, Compl. ¶ 24, Kemron discovered that the contamination plume was approximately 23,000 feet–nearly 4.5 miles–in length, an amount that was ten times the length reported in the Draft Supplemental Feasibility Study, id. ¶¶ 13, 24; cf. supra note 6

---

[7] According to the Draft Supplemental Feasibility Study,

groundwater under the facility property is impacted by dissolved phase TCE.  The highest elevated dissolved phase TCE concentrations were detected immediately southwest of the silo, with the plume extending primarily southeast . . . .  The source for the elevated dissolved phase TCE is suspected to be due to the missile silo operations.

TCE concentrations appear to be originating from the area of the silo. . . .

. . . .

Vadose zone soil contamination has not been identified in the source area based on headspace field screening of soil boring . . . .

Pl.'s Ex. 1 at A6.

[8] The parties did not submit a copy of Task Order 1.

(reporting between 2,300 and 3,003 feet of contamination). Kemron also discovered a "continuing source of contamination . . . in the vadose zone soils of the site to the east and southeast of the silo." Compl. ¶ 13; cf. supra note 7 (reporting that vadoze zone soil contamination had not been detected). Kemron apprised the Corps of the conditions it encountered at Atlas Missile Site 10, indicating that those conditions would "greatly impact the approach that would have to be taken to remediate the site."[9] Compl. ¶ 23. Due to the magnitude and continuing nature of the contamination, Kemron concluded that attaining "Response Complete" by September 30, 2009, was impossible. Id. ¶ 24. Kemron estimated that "it could take twenty years and expenditures far in excess of the contract price to achieve 'Response Complete' status,"[10] id., and instead recommended in its proposed work plan that the Corps change the contract requirements from "Response Complete" to "Remedy-in-Place,"[11] id. ¶ 27. The Corps rejected Kemron's proposed work plan because (1) it failed to provide for "Response Complete" by September 30, 2009, and (2) the "new information with regard to the contamination plume did not warrant a change in the contract's requirements."[12] Id. ¶ 28.

On September 6, 2007, the Corps issued the first unilateral modification to Task Order 1, which extended the date for the achievement of "Response Complete" from September 30, 2009, to September 30, 2012. Id. ¶ 29; accord Pl.'s Ex. 2 at A8-10. Kemron does not allege in its complaint which employee(s) of the Corps issued the first unilateral modification. See Compl. ¶ 29. Nevertheless, a copy of the first unilateral modification indicates that it was signed by

---

[9] Kemron does not allege in its complaint to which employee(s) of the Corps it communicated these findings. See Compl. ¶ 24.

[10] According to Kemron, AIG confirmed its conclusion that a "Response Complete" solution was unachievable. See Compl. ¶ 25 (quoting a letter from AIG's National Accounts Underwriter to Kemron in which AIG indicated that, "[b]ased on the information available regarding the current conditions at the site, it will be difficult for [AIG] to concur with and consent to a revised Remedial Plan that requires a response complete (RC) milestone be met prior to the Termination Date"). Because the AIG policy coverage period extended through July 6, 2014, Kemron believed that, "in AIG's judgment, it was unreasonable to conclude that 'Response Complete' could be achieved as far out as July 2014, more than ten years after the Task Order's issuance date." Id. ¶ 26.

[11] "Remedy-in-Place," another term of art used in environmental remediation, means that "the remediation system and other remedial measures are installed and operational at the site, as contemplated by the contract requirements." Compl. ¶ 27.

[12] Kemron does not allege in its complaint which employee(s) of the Corps rejected its proposal. See Compl. ¶ 28.

5

James B. Opitz as the contracting officer.[13]  Pl.'s Ex. 2 at A8; cf. Pl.'s Ex. 6 at A26 (containing Mr. Opitz's electronic mail signature, which identified him as "Chief, Contracting Division" of the Corps' Omaha District).

Kemron objected to the issuance of the modification, contending that "Response Complete" was unrealistic given the presence of a 4.5-mile plume and a continuing source of contamination at Atlas Missile Site 10.[14]  Compl. ¶ 29.  While the Corps remained adamant about preserving the "Response Complete" requirement, Kemron continued to advocate for a "Remedy-in-Place" solution.[15]  Id. ¶ 30.  Ultimately, the parties failed to reach an agreement, and Kemron performed no work under the first unilateral modification.  Id.

The Corps issued a second unilateral modification on May 14, 2008.  Id. ¶ 31; see also Pl.'s Ex. 3 at A12-13 (containing an unsigned copy of the modification with no entry for the name and title of the contracting officer).  The second unilateral modification, among other things: removed the "Response Complete" requirement; adopted a "Remedy-in-Place" solution; indicated that Kemron "will receive no more funding than the balance of the base contract," i.e., the option would not be awarded; and required that Kemron submit a detailed project schedule reflecting a completion date of July 1, 2009.  Pl.'s Ex. 3 at A13.  The second unilateral modification also mandated the approach that Kemron would employ at Atlas Missile Site 10 by requiring installation of water treatment plants (1) at the source, (2) at the leading edge of the plume, and (3) at an intermediate location that would be capable of "capturing the full width of the containment plume . . . ."  Id.

According to Kemron, the second unilateral modification constituted a "significant departure from the performance-based contract that the parties entered into."  Compl. ¶ 32.  Furthermore, AIG "was not asked for, nor did it provide, its approval for the contract changes put in place by the second unilateral modification," and it therefore adopted the position that the second unilateral modification violated the insurance agreement.  Id. ¶ 34.  As such, AIG refused to cover the cost of work associated with the second modification.  Id.

---

[13]  In its opposition brief, Kemron acknowledges that Mr. Opitz was identified as the contracting officer on the Contractor Performance Assessment Report ("CPAR").  See Pl.'s Opp'n Def.'s Mot. Dismiss ("Opp'n") 16, 19.

[14]  Kemron does not allege in its complaint how or to which Corps employee(s) it conveyed its objections to the issuance of the first unilateral modification.  See Compl. ¶ 29.

[15]  Kemron does not allege in its complaint which Corps employee(s) insisted upon a "Response Complete" requirement and to whom it advocated its position.  See Compl. ¶ 30.

In response to the issuance of the second unilateral modification, AIG informed Kemron that,

> "based on current site conditions[,] only one treatment system at the end of the plume is reasonable and necessary.  [AIG Domestic Claims] will only recognize reasonable and necessary costs for one groundwater treatment system.  The two additional systems are in excess.  Current and future costs associated with the second and third groundwater system will be denied."

Id. ¶ 35 (quoting a November 19, 2008 letter from AIG to Kemron).  Thereafter, Kemron submitted a groundwater design that incorporated one water treatment plant.  Pl.'s Ex. 5 at A21.  Although Kemron believed that the water treatment systems "exceed[ed] the solution contemplated in its initial proposal," Compl. ¶ 33, it agreed, "under duress," to install more systems than it believed were necessary, Pl.'s Ex. 5 at A22.

## C.  The Contractor Performance Assessment Reporting System ("CPARS")

### 1.  General Purpose and Characteristics of a CPAR

The CPARS "is a paperless contracting initiative" directed by the United States Department of Defense.  Def.'s App. at A91.  "The CPARS process establishes procedures for the collection and use of [past performance information]," and "CPARS-generated [past performance information] is one of the tools used to communicate contractor strengths and weaknesses to source selection officials and Contracting Officers."  Id. at A88.  "The contractor performance evaluation contained in the CPARS is a method of recording contractor performance and should not be the sole method for reporting it to the contractor.  A CPAR should be an objective report of the performance during a period against the contract requirements."  Id.  Its primary purpose is "to ensure that accurate data on contractor performance is current and available for use in source selections through the Past Performance Informational Retrieval System (PPIRS)."  Id. at A91.

Use of a CPAR "is mandatory as it ensures that evaluations will be entered into the CPARS database to provide a centralized data repository of contractor performance information."  Id.; see also id. at A88 ("A CPAR is source selection information because it is in constant use to support ongoing source selections and contains sensitive data concerning a contractor and its performance.").  Specifically,

> [p]erformance assessments will be used as a resource in awarding best value contracts and orders to contractors that consistently provide quality, on-time products and services that conform to contractual requirements.  CPARS can be used to effectively communicate contractor strengths and weaknesses to source selection officials. . . .

> The CPAR assesses a contractor's performance and provides a record, both positive and negative, on a given contract during a specified period of time. Each assessment must be based on objective data (or measurable, subjective data when objective data is not available) supportable by program and contract management data . . . .

Id. at A91 (footnote omitted); see also id. at A92 (noting that the "CPARS process is designed with a series of checks-and-balances to facilitate the objective and consistent evaluation of contractor performance"). The objective data upon which the assessment must be based includes, among other things, contractor operations reviews, status and progress reviews, production and management reviews, management and engineering process reviews, cost performance reports, systems engineering and other technical progress reviews, physical and functional configuration audits, quality reviews and quality assurance evaluations, and functional performance evaluations. Id. at A92.

Five evaluation ratings can be used in a CPAR. An "Exceptional" rating indicates that the contractor's performance "me[t] contractual requirements and exceed[ed] many to the Government's benefit."[16] Id. at A109. A "Very Good" rating indicates that the contractor's performance "m[et] contractual requirements and exceed[ed] some to the Government's benefit."[17] Id. A "Satisfactory" rating indicates that the contractor "me[t] contractual requirements."[18] Id. A "Marginal" rating indicates that the contractor's performance "d[id] not

---

[16] A contractor with an "Exceptional" rating performed "the element or sub-element being assessed . . . with few minor problems for which corrective actions taken by the contractor w[ere] highly effective." Def.'s App. at A109. In order to justify an "Exceptional" rating, the assessing official must identify "multiple significant events and state how they were of benefit to the Government," though "a singular benefit . . . could be of such magnitude that it alone constitutes an Exceptional rating." Id. Additionally, "there should have been NO significant weaknesses involved." Id.

[17] A contractor with a "Very Good" rating performed "the element or sub-element being assessed . . . with some minor problems for which corrective actions taken by the contractor [were] effective." Def.'s App. at A109. In order to justify a "Very Good" rating, the assessing official must identify "a significant event and state how it was a benefit to the Government." Id. Additionally, "[t]here should have been no significant weaknesses identified." Id.

[18] A contractor with a "Satisfactory" rating performed the element or sub-element with "some minor problems for which corrective actions taken by the contractor appear[ed] or were satisfactory." Def.'s App. at A109. In order to justify a "Satisfactory" rating, the assessing official must identify "only minor problems, or major problems the contractor recovered from without impact to the contract." Id. Additionally, "[t]here should have been NO significant weaknesses identified." Id.

meet some contractual requirements."[19]  Id.  Finally, an "Unsatisfactory" rating indicates that the contractor "d[id] not meet most contractual requirements and recovery [was] not likely in a timely manner."[20]  Id.

An initial CPAR is required for new contracts that meet certain threshold requirements and have a period of performance greater than 365 days.  Id. at A101; see also 48 C.F.R. § 42.1502(a) (2009) (requiring that agencies prepare performance evaluations in order "to provide current information for source selection purposes").  The initial CPAR "must reflect evaluation of at least the first 180 days of performance under the contract, and may include up to the first 365 days of performance."  Def.'s App. at A101.  The assessing official is responsible for preparing, reviewing, signing, and processing the CPAR.  Id. at A98.  Specifically, the assessing official must, among other tasks, perform a quality review of the evaluation and may modify CPAR comments and ratings upon review of the contractor's comments.[21]  Id. at A98-99.  The reviewing official "provides the check-and-balance when there is disagreement between the [assessing official] and the contractor."  Id. at A99.  Although the reviewing official has the authority to provide narrative comment, these comments supplement, but do not replace, the ratings or narrative furnished by the assessing official.  Id.  A CPAR becomes final once it is signed by the reviewing official.  Id.

---

[19]  A "Marginal" rating indicates that the "contractual performance of the element or sub-element being assessed reflect[ed] a serious problem for which the contractor ha[d] not yet identified corrective actions."  Def.'s App. at A109.  Furthermore, the contractor's "proposed actions appear[ed] only marginally effective or were not fully implemented."  Id.  In order to justify a "Marginal" rating, the assessing official must "identify a significant event in each category that the contractor had trouble overcoming and state how it impacted the Government."  Id.  A "Marginal" rating "should be supported by referencing the management tool that notified the contractor of the contractual deficiency (e.g., management, quality, safety, or environmental deficiency report or letter)."  Id.

[20]  An "Unsatisfactory" rating indicates that the contractor's "performance of the element or sub-element contain[ed] serious problem(s) for which the contractor's corrective actions appear[ed] or were ineffective."  Def.'s App. at A109.  In order to justify an "Unsatisfactory" rating, the assessing official must "identify multiple significant events in each category that the contractor had trouble overcoming and state how it impacted the Government," although "[a] singular problem . . . could be of such serious magnitude that it alone constitutes an unsatisfactory rating."  Id.  An "Unsatisfactory" rating "should be supported by referencing the management tools used to notify the contractor of the contractual deficiencies (e.g., management, quality, safety, or environmental deficiency reports, or letters)."  Id.

[21]  The assessing official is authorized to revise the contractor's assessment and the accompanying narrative, and must notify the contractor of any revisions that are made to a report as a result of the contractor's comments.  Def.'s App. at A99.

### 2.  The Corps' Issuance of Initial and Final CPARs for Kemron's Performance

On June 27, 2008, shortly after issuance of the second unilateral modification to Task Order 1, the Corps issued an initial CPAR containing an evaluation of Kemron's performance from April 28, 2007, to April 28, 2008.  Compl. ¶ 36.  The initial CPAR identified Mr. Opitz as the contracting officer.  Pl.'s Ex. 5 at A19.  But see Compl. ¶ 40 (alleging that Lieutenant Colonel Matthew Harvey was the contracting officer).  The period of time encompassed by the initial CPAR predated the issuance of the second unilateral modification.  Compl. ¶ 36.  The initial CPAR "was extremely critical" of Kemron's performance and contained the following ratings: "Unsatisfactory" in the Quality of Product or Service and Business Relations categories; "Marginal" for Schedule; and "Satisfactory" for Management of Key Personnel.  Id. ¶ 37. Kemron asserts that the initial CPAR "was written as if the 'Response Complete' parameter was still relevant and had not been changed by the second Unilateral Modification."[22]  Id. ¶ 39.  In essence, the initial CPAR "repeatedly criticized Kemron for not meeting the original, unachievable requirements" set forth in Task Order 1.  Id. ¶ 38.

Kemron was afforded an opportunity to respond to the initial CPAR, id. ¶ 40, which it believed was inaccurate and defamatory, Pl.'s Ex. 4 at A15.  According to Kemron, the initial CPAR "not only failed to reflect the entire context of contract performance, but was also inaccurate on its face."  Compl. ¶ 40.  On June 21, 2008, John M. Dwyer, Kemron's Executive Vice President, composed a letter to Lieutenant Colonel Harvey as the contracting officer.  Pl.'s Ex. 4 at A15-17; see also Compl. ¶ 40 (alleging that Lieutenant Colonel Harvey was the contracting officer).  But see Pl.'s Ex. 4 at A16 (acknowledging that Mr. Opitz, as the contracting officer, corresponded with Kemron in May 2007); Pl.'s Ex. 5 at A19 (identifying Mr. Opitz as the contracting officer on the initial CPAR).  In the letter, Mr. Dwyer wrote:

> I ask that you consider these observations in light of the defamatory information provided in the CPAR and again, consider either re-writing this or pulling the rating altogether until the task order is complete.  I have attached for you[r] information a draft of Kemron's response to the CPAR.  I have also attached a point by point discussion of the CPAR and the inaccuracies in the subject text.  I suspect if this is posted verbatim, the opportunity to continue any sort of civilized working relationship will be quashed.

Pl.'s Ex. 4 at A15.  Mr. Dwyer noted that the CPAR Quality Checklist enumerated specific

---

[22]  For example, the initial CPAR stated: (1) Kemron's "'[d]esign failed to meet the Response Complete by September 12, 2009 requirement'"; (2) Kemron "'assert[ed] the primary reason for slow-moving project progress was the inflexibility of the [Corps] for changing the performance milestones from Response Complete to Remedy-in-Place'"; and (3) Kemron's "'groundwater treatment plant design submitted in January of 2008 was inadequate and did not meet the requirements of the [first] Unilateral Modification.'"  Compl. ¶ 38 (quoting the draft CPAR) (last alteration in original); accord Pl.'s Ex. 5 at A19-21.

guidelines for preparation of the narrative portion of the CPAR and explained his belief that the initial CPAR was "silent on nearly all of these points." Id.  According to Mr. Dwyer, the initial CPAR failed to mention the government's role in Kemron's inability to meet the contract requirements, did not "[t]ell the 'whole story,'" id. at A15-16, and covered a period of time during contract performance that "le[ft] the reader with a v[e]ry narrow and skewed presentation of this task order," id. at A16.  Mr. Dwyer indicated that "refuting the evaluation contained in the CPAR is possible on many levels–contractually, administratively with regard to preservation of coverage and specifically to the mechanics of preparing what constitutes a fair and unbiased CPAR."  Id.  Furthermore, he attributed contract performance issues to the Corps' "culpability in this poorly developed PWS . . . ."  Id. at A17.  Mr. Dwyer also advised Lieutenant Colonel Harvey:

> So, is it to be a continued war of words or a professional approach to completion of this task order?  I have attached a line by line response to the CPAR to provide a clear picture of what can and will be refuted if we are to respond.  I have also attached an unvarnished response that will accompany the list of errors, misstatements and untruths when and if we actually respond to this evaluation.

Id. at A16-17.  Ultimately, Kemron provided comments to the initial CPAR, stating that it "d[id] not concur with this assessment and request[ed] that it be reevaluated."  Compl. ¶ 41.

On July 23, 2008, the Corps released the initial CPAR with Kemron's comments.  Pl.'s Ex. 5 at A19-23.  The evaluation concluded with the following recommendation from Randal K. Petersen, the assessing official: "Given what I know today about the Contractor's ability to execute what [it] promised in [its] proposal, I probably would not award to [it] today given that I had a choice."  Id. at A21.  In its comments, which were incorporated into the initial CPAR, Kemron estimated that the "Unsatisfactory" rating it received would cost it "10s of millions" of dollars in future business, "if [it] survive[s] at all."  Id. at A22; see also Compl. ¶ 51 (alleging that the "negative and far-reaching impact of this single, inaccurate CPAR has the potential to be significant and could result in many millions of dollars in lost or unrealized acquisitions").

Thereafter, Kemron sought revision or withdrawal of the CPAR.  Compl. ¶ 43; see also Pl.'s Ex. 6 at A27 (stating that Kemron "cannot let this inaccurate CPAR stand without correction and challenge").  On August 4, 2008, its counsel contacted Mr. Opitz:

> I request that you refrain from giving [the initial CPAR] final approval and allow KEMRON one last appeal to make some needed revisions.

> As written, the CPAR is erroneous, if not defamatory, in a number of material respects and will unfairly [and] adversely affect KEMRON's business and business prospects.  In a nutshell, as you know, the original task order description was woefully inadequate, and KEMRON has in good faith made every effort to deal with a project at least an order of magnitude larger than anyone

anticipated . . . .

> KEMRON has gone on record with corrections to the CPAR which it believes more accurately describe the facts and circumstances encountered in this project.  We would greatly appreciate the opportunity to review these with you. KEMRON cannot let this inaccurate CPAR stand without correction and challenge, and we ask that you please give us this chance to convince you of the need to set the record straight now rather than later through more formal proceedings.

Pl.'s Ex. 6 at A27.  Mr. Opitz responded to Kemron on August 5, 2008, stating:

> [T]he CPARs process states that the final rating will be made and subsequently be entered into the database by the Assessing Official.  <u>As the Reviewing Official I am limited to only providing any narrative comments that I feel are appropriate.</u>

> I have reviewed your request and believe that the information provided by Kemron in their CPARs submission is sufficient for me to continue with the evaluation process.

<u>Id.</u> at A26 (emphasis added); <u>see also</u> Compl. ¶ 45 (alleging that Mr. Opitz was the reviewing official); Def.'s App. at A99 (describing the authority of the reviewing official); <u>cf.</u> Pl.'s Ex. 4 at A16 (stating, in Kemron's letter to Lieutenant Colonel Harvey, that Mr. Opitz was the contracting officer); Pl.'s Ex. 5 at A34 (containing the final CPAR, which identified Mr. Opitz as the contracting officer).

Apparently dissatisfied with Mr. Opitz's response, Kemron, on August 12, 2008, requested a meeting with Colonel David Press, the Corps' Omaha District Commander and District Engineer, to discuss the initial CPAR and Kemron's "damaged reputation[,] . . . the continuing damage created by this task order, [and] the performance assessment (CPAR) associated with this and long term impact . . . ."  Pl.'s Ex. 7 at A30-31.  The next day, Colonel Press declined Kemron's request, explaining: "I am not available to meet with you, as requested. I am also unclear what the purpose and expected outcome of such a meeting would be and believe it is not appropriate at this time."  <u>Id.</u> at A30.

Kemron continued to request that the Corps amend or withdraw the CPAR.[23]  Compl.
¶ 44.  On January 20, 2009, the contracting officer issued the final CPAR.[24]  Compl. ¶ 44; see
also Pl.'s Ex. 8 at A34-39 (containing the final CPAR).  The final CPAR was virtually identical
to the draft CPAR, with the exception that Mr. Opitz inserted the following comment in the
space reserved for "Review by Reviewing Official":

> After discussing the ratings with the Assessing Official Representative, I support
> the marginal and satisfactory ratings given Schedule and Management of Key
> Personnel respectively.  However, it is my determination that the contractor[']s
> performance and the documentation used to justify the unsatisfactory ratings for
> Quality of Product/Service and Business Relations do not meet the established
> rating criteria for an unsatisfactory rating.  I believe a marginal rating is the more
> appropriate rating for each of these two objectives.

Pl.'s Ex. 8 at A38.  Mr. Opitz's "comments did not eliminate the unreasonably critical ratings
and comments that were included in the CPAR, nor did Mr. Opitz reasonably explain why
Kemron should receive even 'Marginal' ratings given that the original contract requirements
were admittedly unachievable."  Compl. ¶ 46; cf. Def.'s App. at A99 (indicating that the
reviewing official's comments do not replace the ratings and narratives furnished by the
assessing official).

Following the issuance of the final CPAR, Kemron again sought relief from the Corps.
On February 17, 2009, Kemron contacted Mr. Petersen in an effort to "engage the [Corps] in
order to mitigate the damage to Kemron's reputation."  Compl. ¶ 47.  Thereafter, on February 25,
2009, Kemron, through its counsel, contacted the Corps' counsel via electronic mail and
"restated its position that the CPAR should be withdrawn . . . ."  Id. ¶ 48.  In this electronic mail
communication, Kemron proposed the following options:

> 1.  Immediately file suit at the Court of Federal Claims. . . .
>
> 2.  Alternatively, although not a prerequisite to filing at the Court, we would be
> willing to submit a claim at the agency level and work in good faith to resolve this
> issue amicably with the Contracting Officer . . . , provided that we received some

_____

[23]  Kemron does not allege in its complaint how or to which individual(s) at the Corps it
addressed its concerns following Colonel Press's denial of its request for a meeting.  See Compl.
¶ 44.

[24]  Kemron does not allege in its complaint the identity of the Corps employee who,
acting as the contracting officer, issued the final CPAR.  See Compl. ¶ 44.

assurance that the process would be conducted in a speedy manner.[25]  Specifically, we propose the following:

> a.  The process would be conducted in accordance with the following timeline [sic]:
>
> •  Kemron would file its claim at the earliest possible date . . . .  The claim would, at this time, seek only the withdrawal of the CPAR.
> •  The [contracting officer]'s written response to the claim would be issued within thirty (30) days from the date the claim was received.
> •  The settlement or ADR process would be undertaken and concluded within thirty (30) days of the issuance of the [contracting officer]'s final decision.

Pl.'s Ex. 9 at A41 (footnote added); <u>accord</u> Compl. ¶ 48.  The Corps declined Kemron's proposal.  Compl. ¶ 48.

Kemron's final CPAR remains "available to all Government procurement officials . . . ." <u>Id.</u> ¶ 54.  As such, it "may be considered as part of Kemron's past performance evaluation in future procurements."  <u>Id.</u> ¶ 50; <u>accord id.</u> ¶ 2.  In at least one unrelated procurement, Kemron has addressed the CPAR at issue in response to its past performance narrative.  <u>See</u> Pl.'s Ex. 10 at A44 (explaining the circumstances giving rise to the CPAR at issue and requesting that "the unfavorable CPAR . . . not be considered" in the evaluation of one of Kemron's proposals).

## II.  PROCEDURAL HISTORY

Kemron filed its complaint in the United States Court of Federal Claims ("Court of Federal Claims") on March 9, 2009.  It alleges that the Corps' issuance of the final CPAR, "along with the [Corps'] continued refusal to consider the propriety of the [final] CPAR, constitutes a final agency decision under the Contract Disputes Act."  Compl. ¶ 49.  The CPAR, which is maintained in a database accessible to all government procurement personnel, is, Kemron claims, inaccurate, unfair, unreasonable, and has the "potential to substantially damage Kemron's business reputation and affect its ability to win new business."  <u>Id.</u> ¶ 54.  Kemron also contends that the Corps breached the covenant of good faith and fair dealing by issuing a "negative and highly critical CPAR based on a set of contract requirements that it knew were both obsolete and impossible to achieve."  <u>Id.</u> ¶ 58.  It requests, among other things, a declaration that the CPAR was unreasonable and contrary to law, and an order directing that the Corps rescind or substantially modify the evaluation.  <u>Id.</u> ¶ 2.

---

[25]  The electronic mail communication did not identify the contracting officer by name. <u>See</u> Pl.'s Ex. 9 at A41.

In the instant motion, defendant contends that the court lacks jurisdiction over the complaint because plaintiff did not file a claim with the contracting officer, as required by the CDA. It also asserts that the court cannot award the injunctive relief that Kemron requests. On February 22, 2010, the court heard oral argument on defendant's motion, and the parties subsequently filed supplemental briefs related to additional authority upon which defendant relied during oral argument. With briefing fully completed, the court is prepared to rule.

## III.  LEGAL STANDARDS

### A.  RCFC 12(b)(1) Motion to Dismiss

The burden of establishing the court's subject matter jurisdiction resides with the party seeking to invoke it. McNutt v. Gen. Motors Acceptance Corp. of Ind., 298 U.S. 178, 189 (1936); see also Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988) (stating that the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence). The court "consider[s] the facts alleged in the complaint to be true and correct." Reynolds, 846 F.2d at 747; see also Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995) (recognizing the court's obligation to "assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor"); cf. Betz v. United States, 40 Fed. Cl. 286, 290 (1998) (noting that the court is not required to accept plaintiff's framing of the complaint and that it should "look to plaintiff's factual allegations to ascertain the true nature of the claims"). If the defendant or the court questions jurisdiction, the plaintiff cannot rely solely on allegations in the complaint but must bring forth relevant, adequate proof to establish jurisdiction. See McNutt, 298 U.S. at 189. In deliberating on a motion to dismiss for lack of subject matter jurisdiction, the court may examine relevant evidence in order to decide any factual disputes. See Moyer v. United States, 190 F.3d 1314, 1318 (Fed. Cir. 1999); Reynolds, 846 F.2d at 747. If the court finds that it lacks subject matter jurisdiction over a claim, then it must dismiss that claim. Matthews v. United States, 72 Fed. Cl. 274, 278 (2006); see also RCFC 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.").

### B.  Subject Matter Jurisdiction

Whether the court possesses jurisdiction to decide the merits of a case is a threshold matter. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998); see also Matthews, 72 Fed. Cl. at 278 (stating that subject matter jurisdiction is "an inflexible matter that must be considered before proceeding to evaluate the merits of a case"). "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868). The court's "general power to adjudicate in specific areas of substantive law . . . is properly raised by a [Rule] 12(b)(1) motion." Palmer v. United States, 168 F.3d 1310, 1313 (Fed. Cir. 1999). The parties or the court sua sponte may challenge the court's subject matter jurisdiction at any time.

Arbaugh v. Y & H Corp., 546 U.S. 500, 506 (2006).

The ability of the Court of Federal Claims to entertain suits against the United States is limited.  "The United States, as sovereign, is immune from suit save as it consents to be sued." United States v. Sherwood, 312 U.S. 584, 586 (1941).  A waiver of immunity "cannot be implied but must be unequivocally expressed."  United States v. King, 395 U.S. 1, 4 (1969).

The Tucker Act provides that the Court of Federal Claims possesses jurisdiction "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2006).  It also confers upon the Court of Federal Claims "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the Contract Disputes Act of 1978, including . . . other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act." Id. § 1491(a)(2).

## C.  Contract Disputes Act of 1978

Kemron's complaint implicates 28 U.S.C. § 1491(a)(2), which permits the Court of Federal Claims to exercise jurisdiction over CDA claims.  "Under the CDA, this Court's jurisdiction is predicated upon a contractor meeting two fundamental requirements: (1) the submission of a written claim to the contracting officer and (2) the agency's issuance of a final decision." OK's Cascade Co. v. United States, 87 Fed. Cl. 739, 745 (2009); see also James M. Ellett Constr. Co. v. United States, 93 F.3d 1537, 1541-42 (Fed. Cir. 1996) ("[F]or the court to have jurisdiction under the CDA, there must be both a valid claim . . . and a contracting officer's final decision on that claim.").  The CDA provides that, if a contractor has a dispute with the government "relating to a contract," then the contractor shall submit a written claim to the contracting officer within six years after the accrual of the claim.  41 U.S.C. § 605(a). Thereafter, the contracting officer must issue a decision "within a reasonable time," after having considered factors such as the "size and complexity of the claim" and the "adequacy of the information in support of the claim."[26] Id. § 605(c)(3); see also L & D Servs., Inc. v. United States, 34 Fed. Cl. 673, 677 (1996) ("Section 605(c) establishes maximum periods within which a contracting officer must issue a decision on a claim–either within 60 days or within a reasonable time.").  The contracting officer's decision must be in writing, "shall state the reasons for the decision reached, and shall inform the contractor of his rights as provided in this chapter." 41 U.S.C. § 605(a); accord 48 C.F.R. § 33.211 (2009).  A contracting officer's failure to issue a decision "within the period required" is deemed to be a decision denying the claim.  41 U.S.C. § 605(c)(5).  The decision of the contracting officer is final unless the contractor makes an

---

[26]  Because plaintiff seeks nonmonetary relief, the sixty-day time period for the contracting officer's decision specified in 41 U.S.C. § 605(c)(1)-(2) with respect to monetary claims is inapplicable.

authorized appeal.  Id. § 605(b).  A contractor may appeal a contracting officer's decision to the Court of Federal Claims.  Id. § 609(a)(1); see also Sharman Co. v. United States, 2 F.3d 1564, 1568 (Fed. Cir. 1993) ("Under the CDA, a final decision by the contracting officer on a claim, whether asserted by the contractor or the government, is a 'jurisdictional prerequisite' to further legal action thereon."), overruled on other grounds by Reflectone, Inc. v. Dalton, 60 F.3d 1572, 1572 (Fed. Cir. 1995) (en banc).

## IV.  DISCUSSION

The gravamen of defendant's jurisdictional challenge is that Kemron failed to present a claim to the contracting officer.  Def.'s Mot. Dismiss ("Mot.") 15-16; see also id. at 15 ("Kemron was required to submit any claims to the contracting officer before filing suit.  It failed to do so." (footnote omitted)).  A determination of whether this court possesses jurisdiction over the complaint therefore requires an examination of whether Kemron submitted a "claim" to the contracting officer.

### A.  What Constitutes a Claim?

The CDA does not define the meaning of the word "claim."  BLR Group of Am., Inc. v. United States, 84 Fed. Cl. 634, 639 (2008); accord Todd Constr., L.P. v. United States, 85 Fed. Cl. 34, 42 (2008).  Therefore, in order to determine whether a contractor's demand constitutes a "claim," the court must look to the regulations "implementing the CDA, the language of the contract in dispute, and the facts of the case."  Reflectone, Inc., 60 F.3d at 1575 (citing Garrett v. Gen. Elec. Co., 987 F.2d 747, 749 (Fed. Cir. 1993)).

The Federal Acquisition Regulation ("FAR") defines a "claim" as "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract."  48 C.F.R. § 52.233-1(c).  Because Kemron is not seeking money damages or the adjustment of contract terms, see, e.g., Compl. ¶¶ 2, 52-55 (requesting declaratory relief), there is no requirement that it make a request for a sum certain.  GPA-I, LP v. United States, 46 Fed. Cl. 762, 766 (2000).  Therefore, Kemron must satisfy two requirements in order to set forth a nonmonetary claim: (1) make a "written demand seeking . . . other contract relief[] . . . as a matter of right," Reflectone, Inc., 60 F.3d at 1576; and (2) submit the request to the contracting officer for a final decision, GPA-I, LP, 46 Fed. Cl. at 767.

"[T]he phrase 'as a matter of right' in the regulatory definition of a 'claim' requires only that the contractor specifically assert entitlement to the relief sought.  That is, the claim must be a demand for something due or believed to be due . . . ."  Alliant Techsys., Inc. v. United States, 178 F.3d 1260, 1265 (Fed. Cir. 1999); see also Precision Pine & Timber, Inc. v. United States, 62 Fed. Cl. 635, 643 (2004) (defining a "claim" as "'[a] demand for something as due; an assertion of a right to something'" (quoting 3 Oxford English Dictionary 261 (2d ed. 1989))).  The CDA contains "no requirement . . . that a 'claim' must be submitted in any particular form or use any

particular wording." Contract Cleaning Maint., Inc. v. United States, 811 F.2d 586, 592 (Fed. Cir. 1987); see also GPA-I, LP, 46 Fed. Cl. at 767 (noting that a contractor need not employ "'[m]agic words'" (quoting Transam. Ins. Corp. v. United States, 973 F.2d 1572, 1578 (Fed. Cir. 1992), overruled in part on other grounds by Reflectone, Inc., 60 F.3d at 1579 & n.10)). Rather, "[a]ll that is required is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis . . . of the claim." Contract Cleaning Maint., Inc., 811 F.2d at 592. In other words, "the intent of the 'claim' governs." Transam. Ins. Corp., 973 F.2d at 1576.

Under certain circumstances, a series of correspondence may, when taken together, comprise a clear and unequivocal statement such that it provides the contracting officer with notice of the basis for the contractor's claim. See Kalamazoo Contractors, Inc. v. United States, 37 Fed. Cl. 362, 368 (1997); accord GPA-I, LP, 46 Fed. Cl. at 767. But cf. GPA-I, LP, 46 Fed. Cl. at 767 (noting that "a contractor's suggestion of a meeting and expression of hope that a dispute could be settled does not prevent a writing from being a CDA claim"). Nevertheless, "[c]orrespondence which indicates disagreement during negotiations, . . . does not qualify as a valid CDA claim." Kalamazoo Contractors, Inc., 37 Fed. Cl. at 368. A contractor's own characterization of its demand as a "claim" "does not automatically render the demand a valid claim for purposes of the CDA." Executive Court Reporters, Inc. v. United States, 29 Fed. Cl. 769, 774 n.7 (1993) (citing Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1394 (Fed. Cir. 1987)).

## B. To Whom Must a Claim Be Submitted?

The CDA explicitly requires that claims be submitted to the contracting officer: "All claims by a contractor against the government relating to a contract shall . . . be submitted to the contracting officer for a decision." 41 U.S.C. § 605(a) (emphasis added); see also James M. Ellett Constr. Co., 93 F.3d at 1541-42 (requiring, as a jurisdictional prerequisite, that the contracting officer issue a final decision on the claim). When it enacted the CDA, Congress nevertheless recognized that a contracting officer's role is flexible:

> Equally important is a thorough knowledge by the contractor of the role and authority that the contracting officer plays in the decisionmaking process of the agency he represents. . . . While the objective may be to make the contracting officer the focal point for decisions, practicability dictates that the extent to which the contracting officer relies on his own judgment or abides by the advice or determination of others is dependent on a variety of factors, including the officer's personal knowledge, capability, and executive qualities, as well as the nature of the particular procurement. With so many variables, it is impossible to generalize as to what the contracting officer's role should be in all situations. In addition, it is unrealistic to suggest that the various levels of management responsible for the projects and programs to which a contract relates and that bear the responsibility for the propriety and wisdom of the agency's action should at all times remain

aloof from the manner in which contracts are administered and contractual actions
are taken.

Thus, in the disputes and remedies area, the procuring agencies should
have flexibility in deciding what role the contracting officer will have.  Most
importantly, the agencies, whatever role they decide to give the contracting
officer, must make clear that role to the contractor.  Thus, if for one reason or
another, the contracting officer is not the primary decisionmaker on a contract
matter, the Government must tell the contractor this, and tell the contractor who is
making the decision.  From this course of action the contractor will at all times
know with whom he is dealing in matters under dispute.

S. Rep. No. 1118, at 21-22 (1978), as reprinted in 1978 U.S.C.C.A.N. 5235, 5255-56 (emphasis
added).  Thus, the CDA "does not . . . require that the claims be sent only to the contracting
officer, or necessarily directly to that officer."  Neal & Co. v. United States, 945 F.2d 385, 388
(Fed. Cir. 1991).  As the United States Court of Appeals for the Federal Circuit ("Federal
Circuit") stated in Dawco Construction, Inc. v. United States, the CDA "simply identifies the
person to whom the dispute is to be 'submitted' for a final decision" and that, "once a claim is
made, the parties must 'commit' the claim to the contracting officer and 'yield' to his authority to
make a final decision."  930 F.2d 872, 880 (Fed. Cir. 1991) (emphasis added), overruled in part
on other grounds by Reflectone, Inc., 60 F.3d at 1579.

With these principles in mind, the court addresses whether Kemron submitted a "claim"
to the contracting officer such that it satisfied the jurisdictional prerequisites to asserting a CDA
claim for nonmonetary relief.  Record Steel & Constr., Inc. v. United States, 62 Fed. Cl. 508, 520
(2004) (holding that the court possesses jurisdiction "to review contractor performance
evaluations if the pertinent requirements of the CDA are met" (emphasis added)); see also Todd
Constr., L.P., 85 Fed. Cl. at 42 (determining that "submission of a claim to the contracting officer
and obtaining a decision on that claim is a 'jurisdictional prerequisite' to an action in this Court
seeking review of the contracting officer's decision" (citing BLR Group of Am., Inc., 84 Fed. Cl.
at 647-48)).

## C.  Analysis of Kemron's Written Communications With the Corps

Kemron argues that it has satisfied the requirements of the CDA.  First, it asserts that its
July 21, 2008 letter to Lieutenant Colonel Harvey constituted a written claim because it
"specifically sought both changes to or a withdrawal of the adverse evaluation" and indicated
Kemron's nonconcurrence with the initial CPAR.  Opp'n 15-16.  "These facts, by themselves,"
Kemron submits, "are sufficient to establish that [it] submitted a valid claim to the Contracting
Officer."  Id. at 16.  Second, Kemron asserts satisfaction of the requirements of the CDA based
upon its continued efforts to seek changes to the initial CPAR, citing an August 4, 2008
electronic mail communication to Mr. Opitz, id. at 16-17, and an August 12, 2008 electronic mail
communication to Colonel Press, id. at 17.  Third, Kemron cites its efforts to seek relief after the

19

final CPAR was issued, including a February 17, 2009 electronic mail communication to Mr. Petersen and its counsel's electronic mail communication to agency counsel dated February 25, 2009.  Id.  According to Kemron, these continued efforts to engage Corps employees demonstrate that it "far exceeded the minimum requirements necessary to state a valid CDA claim."  Id. at 18.  Ultimately, Kemron maintains that the issuance of the final CPAR constituted a denial of its claim and a final agency decision.  Id. at 19.

Defendant contends that Kemron never filed a claim with the contracting officer: "To bring a valid CDA claim, Kemron was required to file a claim with the responsible contracting officer and receive a response (or deemed denial).  Kemron has done neither."  Reply Supp. Mot. ("Reply") 8; see also Mot. 5 ("Kemron has not presented a claim within the meaning of the CDA."), 14 (asserting that Kemron never submitted a CDA claim to the contracting officer because it "failed to seek anything to which it [was] entitled 'as a matter of right'"), 17 ("There has been neither a contracting officer final decision, nor a 'deemed denial.'").  First, defendant emphasizes that "one or more of [Kemron's] pre-issuance communications . . . were simply part of the normal process of procuring the CPAR according to the FAR and agency guidelines."  Reply 9; see also id. at 10 (contending that Kemron's comments to the initial CPAR were directed toward a "'draft' document which[,] by its very nature[,] was not, and cannot[] be construed to be a 'final' document").  In support of this position, defendant states:

> If Kemron's pre-issuance communications concerning the initial CPAR constitute its claim, how can it obtain relief concerning the final CPAR which did not exist at the time of its claim?  It is illogical, and certainly contrary to binding precedent concerning the CDA for a contractor to be able to obtain declaratory relief concerning a matter not set forth in its claim.  Here, Kemron's alleged "claims" concern the draft CPAR.  Yet it seeks declaratory relief concerning the accuracy of the final CPAR.  Even more untenable, Kemron's alleged "claims" concern the draft CPAR, yet Kemron's complaint in this Court seeks injunctive relief concerning the final CPAR, namely modification or removal.

Id. at 11-12; see also id. at 11 ("Kemron only commented on a draft and did not submit a claim concerning the final CPAR.").  Second, defendant asserts that Kemron itself conceded that no claim was filed with the contracting officer in its counsel's February 25, 2009 electronic mail communication to agency counsel.  Id. at 9; see also id. at 8 ("Strangely, although it is seeking removal and/or modification of the final CPAR, Kemron admits that it did not file any claim or other demand with the contracting officer after issuance of the final CPAR.").  Thus, defendant states, "Kemron alleges that the final contracting officer decision was by the reviewing official, since it did not consider the initial assessment of Kemron's performance by the assessing official a final contracting officer decision pursuant to the CDA."  Mot. 9 (citing Compl. ¶ 49).

### 1. Kemron's July 21, 2008 Communication Does Not Constitute a "Claim"

Kemron's July 21, 2008 letter to Lieutenant Colonel Harvey does not constitute a claim under the CDA. The overall purpose of this letter was to "offer a couple of observations relevant to the overall evaluation" contained in the initial CPAR with which Kemron disagreed. Pl.'s Ex. 4 at A15. Specifically, Kemron sought to apprise Lieutenant Colonel Harvey that "refuting the evaluation contained in the CPAR [wa]s possible on many levels," id. at A16, and, to that end, it "attached for you[r] information a draft of KEMRON's response to the CPAR" and "also attached a point by point discussion of the CPAR and the inaccuracies in the subject text," id. at A15. In essence, Kemron's letter to Lieutenant Colonel Harvey expressed frustration with what it perceived as a one-sided presentation of the relevant facts and circumstances related to its performance of the task order:

> So, is it to be a continued war of words or a professional approach to completion of this task order? I have attached a line by line response to the CPAR to provide a clear picture of what can and will be refuted if we are to respond. I have also attached an unvarnished response that will accompany the list of errors, misstatements and untruths when and if we actually respond [to] this evaluation. Our unvarnished response does in fact bring in the whole story . . . .

Id. at A16-17 (emphasis added); see also id. at A15 ("I suspect if this is posted verbatim, the opportunity to continue any sort of civilized working relationship will be quashed." (emphasis added)). Kemron requested that Lieutenant Colonel Harvey "consider these observations in light of the defamatory information provided in the CPAR and, again, consider either re-writing this or pulling the rating altogether until the task order is complete." Id. at A15 (emphasis added).

The "intent of the 'claim' governs," Transam. Ins. Corp., 973 F.2d at 1576, and Kemron's request that Lieutenant Colonel Harvey "consider" its observations, together with language forecasting a complete breakdown in relations between Kemron and the Corps, does not constitute a demand for something due or believed to be due. Alliant Techsys., Inc., 178 F.3d at 1265. The CPAR process had not yet been completed at the time Kemron submitted its letter. Indeed, Kemron's letter predated its response to the initial CPAR and conveyed uncertainty as to whether it would ultimately submit a response. See Pl.'s Ex. 4 at A16-17 (noting "what can and will be refuted if we are to respond" and attaching an "unvarnished response . . . if we actually respond to this evaluation" (emphasis added)). Kemron was within its rights to submit a response to the initial CPAR: "Agency evaluations of contractor performance prepared under this subpart shall be provided to the contractor as soon as practicable after completion of the evaluation. Contractors shall be given a minimum of 30 days to submit comments, rebutting statements, or additional information." 48 C.F.R. § 42.1503(b) (emphasis added); see also Def.'s App. at A99 (containing the CPARS Policy Guide, which provides that the designated contractor representative possesses the authority to, among other things, "[r]eview/comment/return evaluation to [the Assessing Official] within 30 days"). Therefore, Kemron's letter reflects an expression of dissatisfaction with the initial CPAR, rather than a clear and unequivocal statement

providing adequate notice of the basis of a claim.  <u>Contract Cleaning Maint., Inc.</u>, 811 F.2d at 592.

Kemron asserts that <u>BLR Group of America, Inc.</u> supports its contention that its July 21, 2008 letter to Lieutenant Colonel Harvey constitutes a claim for CDA purposes.  Opp'n 18.  In <u>BLR Group of America, Inc.</u>, the contracting officer, who also served as the assessing official, notified the contractor that an initial CPAR had been prepared.  84 Fed. Cl. at 636.  Thereafter, the contractor requested a meeting with the agency, during which it provided "substantive rebuttals to many of the items in the CPAR and requested information from the Air Force concerning how it prepared the CPAR."  <u>Id.</u>  After the contractor did not receive the information it requested, it submitted written comments "in response to the initial CPAR signed by the Assessing Official/contracting officer . . . ."[27]  <u>Id.</u> at 637; <u>see also</u> <u>id.</u> (stating that the contractor's comments "'requested that the Assessing Official exercise her discretion to re-evaluate the CPAR and correct the initial ratings and narrative'" (quoting the complaint)).  In its comments, the contractor also indicated that it did not concur with the assessment and requested reevaluation.  <u>Id.</u>  The court determined that the contractor's comments to the initial CPAR constituted a valid claim under the CDA because there was "no question that plaintiff's request for a fair and accurate CPAR was made to the contracting officer in writing and sought relief related to the contract," <u>id.</u> at 642, a conclusion that rested, in part, upon the fact that the defendant did not contest that the contractor had submitted a "'written demand' to the contracting officer," <u>id.</u> at 639 n.5; <u>see also</u> <u>id.</u> at 640 (noting the contractor's contention that it "'demanded in writing that the CPAR be corrected'").  The claim, the court concluded, was deemed denied upon the issuance of the final CPAR because it was issued by the reviewing official, rather than the assessing official/contracting officer.  <u>See</u> <u>id.</u> at 648.

Kemron's reliance upon <u>BLR Group of America, Inc.</u> to support its position that its July 21, 2008 letter constituted a claim is misplaced.  The <u>BLR Group of America, Inc.</u> court expressly held that the contractor's written comments to the initial CPAR constituted the CDA claim in that case.  <u>Id.</u> at 642.  Here, Kemron's July 21, 2008 letter did not constitute its formal written response to the initial CPAR.  In fact, the letter predated its submission of formal written comments to the initial CPAR.  <u>See</u> Pl.'s Ex. 5 at A23 (indicating that Kemron's response was dated July 23, 2008).  On this basis alone, the July 21, 2008 letter does not constitute a claim under the CDA.

---

[27] Kemron asserts that the <u>BLR Group of America, Inc.</u> court determined that "'a written response to the CPAR requesting that the Assessing Official correct the ratings and narrative contained in the initial CPAR'" constituted a valid claim.  Opp'n 16 (quoting 84 Fed. Cl. at 639).  However, Kemron ignores the fact that the assessing official in <u>BLR Group of America, Inc.</u> also held the title of contracting officer.  <u>See</u> 84 Fed. Cl. at 637.  Therefore, the contractor's written response to the initial CPAR in <u>BLR Group of America, Inc.</u> ultimately was a submission to the contracting officer.  <u>See</u> <u>id.</u>

Such a determination is also consistent with the circumstances encountered in <u>Record Steel & Construction, Inc.</u>  In that case, after the contractor received an adverse performance evaluation from the agency, its president submitted a letter to the contracting officer's representative "'request[ing] that the marginal ratings be reevaluated and changed based on the information provided <u>and that this document be added as a permanent attachment to the evaluation.</u>'"  62 Fed. Cl. at 519 (emphasis added).  In essence, the contractor's letter to the contracting officer's representative constituted its formal response to the evaluation.  <u>See id.</u> (indicating that the agency informed the contractor that, "'[i]f you choose to respond to this evaluation, your comments will be made a part of the official record'").  Accordingly, the court determined that the letter constituted a claim for purposes of the CDA.  <u>Id.</u>; <u>see also id.</u> (stating that the contracting officer's representative denied the contractor's request that was contained in its response).

In this case, Kemron's July 21, 2008 letter did not request that Lieutenant Colonel Harvey include its narrative or the attachments thereto–"a draft of KEMRON's response to the CPAR" and "a point by point discussion of the CPAR"–as part of its response to the initial CPAR.[28]  Pl.'s Ex. 4 at A15.  Kemron has not alleged that the letter constituted its formal response to the initial CPAR, and it expressly indicated therein uncertainty as to whether it would ultimately submit a formal response.  <u>Id.</u> at A16-17.  That the letter did not constitute Kemron's formal response to the initial CPAR is further supported by Kemron's submission of a formal response to the initial CPAR on July 23, 2008.  <u>See</u> Pl.'s Ex. 5 at A21-23.  Therefore, Kemron's letter cannot be construed as a claim because it did not constitute a formal written response to the initial CPAR and sought only to provide Lieutenant Colonel Harvey with "observations," <u>id.</u> at A15, that Kemron believed "[brought] in the whole story," <u>id.</u> at A17.

## 2. Kemron's July 23, 2008 Written Response to the Initial CPAR Does Not Constitute a "Claim"

To the extent that Kemron asserts that its July 23, 2008 response to the initial CPAR constitutes a claim under the CDA, <u>see</u> Compl. ¶¶ 40-41 (alleging that Kemron responded to the initial CPAR on numerous occasions, including providing its comments onto the initial CPAR), such a position is misplaced.  In <u>BLR Group of America, Inc.</u>, the contractor submitted its written comments in response to the initial CPAR and expressly requested that the assessing official, who also served as the contracting officer, "'exercise her discretion to re-evaluate the CPAR and correct the initial ratings and narrative.'"  84 Fed. Cl. at 637 (quoting the complaint).  Moreover, the contractor in <u>Record Steel & Construction, Inc.</u> submitted a letter constituting its formal response to the evaluation to the contracting officer's representative.  62 Fed. Cl. at 519.

---

[28]  Kemron alleges that Lieutenant Colonel Harvey was the contracting officer.  Compl. ¶ 40.  For purposes of the instant motion, the court must consider the facts alleged in the complaint to be true and correct.  <u>Reynolds</u>, 846 F.2d at 747.

The circumstances in this case are distinguishable. Kemron does not allege that its formal written response to the initial CPAR was submitted to Lieutenant Colonel Harvey as the contracting officer, or to his representative. See Compl. ¶ 41; supra note 27. Although Kemron requested that the initial CPAR be reevaluated, Pl.'s Ex. 5 at A23, it did not request that the contracting officer exercise his discretion to reevaluate the initial CPAR and correct the ratings and narrative. Instead, Kemron's narrative was directed, in large part, at the conduct of the assessing official:

> KEMRON was assured days before the CPAR release it was to be fair and accurate. . . . The inaccuracies and falsehoods are so great that the only reasonable conclusion is the [Assessing Official], who has personal knowledge of the true facts, intentionally and with malice and reckless disregard for the truth intentionally misrepresented the situation . . . .

> CPAR guidance also requires the [Assessing Official] to present the whole story. . . .

> . . . .

> Contrary to the [Assessing Official], KEMRON[']s efforts have been commendable and have provided substantial benefit to the government. . . . Rather than acknowledging KEMRON's extraordinary efforts to correct the inaccuracies of the Corps work, the Corps has instead done nothing but wrongfully berate KEMRON for not doing more to fix the problem the Corps created . . . .

> The Corps NEVER accepted responsibility for the botched study. . . .

> One final and very serious issue with regard to this CPAR is the fact that the [Assessing Official] and technical staff assigned by the Corps to this [task order] are the same that performed the flawed studies . . . .

Id. (emphasis added). Accordingly, Kemron's written response to the initial CPAR does not constitute a claim for purposes of the CDA.

### 3. Kemron's August 4, 2008 Electronic Mail Communication to Mr. Opitz Does Not Constitute a "Claim"

Kemron next asserts that, as part of its continued effort to seek changes to the initial CPAR, its counsel contacted Mr. Opitz via electronic mail on August 4, 2008: "[P]laintiff's outside counsel wrote an e-mail to Mr. James Opitz, the Omaha District Contracting Division Chief and the official identified as the Contracting Officer on the CPAR." Opp'n 16. To the extent that Kemron asserts that this correspondence constituted a claim, such a position is

misplaced.  Kemron stated:

> I understand that the KEMRON CPAR is currently in your hands <u>awaiting final comment and approval</u>.  On behalf of KEMRON, I <u>request that you refrain from giving it final approval and allow KEMRON one last appeal to make some needed revisions</u>.
>
> . . . .
>
> KEMRON has gone on record with corrections to the CPAR which it believes more accurately describe the facts and circumstances encountered in this project.  We <u>would greatly appreciate the opportunity to review these with you</u>.  KEMRON cannot let this inaccurate CPAR stand without correction and challenge, and we ask that you <u>please give us this chance to convince you</u> of the need to set the record straight <u>now rather than later through more formal proceedings</u>.

Pl.'s Ex. 6 at A27 (emphasis added).  Nothing in Kemron's August 4, 2008 communication can be reasonably construed as a claim to the contracting officer or his representative.[29]  Kemron does not assert any demand for something that is due or believed to be due.  <u>Alliant Techsys., Inc.</u>, 178 F.3d at 1265.  Although Kemron already responded to the initial CPAR, the evaluation process remained ongoing because the final CPAR had not yet been issued, a fact that Kemron explicitly acknowledged.  Significantly, Kemron did not request that Mr. Opitz reevaluate the initial CPAR and correct the ratings and narrative.  <u>See</u> <u>BLR Group of Am., Inc.</u>, 84 Fed. Cl. at 637.  Instead, Kemron merely requested an opportunity to review its comments to the initial CPAR with Mr. Opitz and to "convince" him that its comments warranted evaluation.  Pl.'s Ex. 6 at A27.  At best, Kemron's request for a meeting with Mr. Opitz in order to "set the record straight <u>now rather than later through more formal proceedings</u>," <u>id.</u> (emphasis added), evidences an attempt to convey its concerns about the potential substance of the final CPAR, not submission of a claim demanding relief from the contracting officer.  Accordingly, Kemron's August 4, 2008 communication to Mr. Opitz does not constitute a claim for purposes of the CDA.

---

[29]  Notwithstanding contradictions or inconsistencies in the record concerning the identity of the contracting officer, the complaint alleges that Lieutenant Colonel Harvey was the contracting officer, Compl. ¶ 40, and that Mr. Opitz was the Corps' Omaha District Contracting Division Chief, <u>id.</u> ¶ 42.  Because the court must draw all reasonable factual inferences in favor of Kemron, <u>Henke</u>, 60 F.3d at 797, the court construes the August 4, 2008 communication to Mr. Opitz, the Chief of the Contracting Division, as a communication directed toward the contracting officer's representative.

### 4.   Kemron's August 12, 2008 Electronic Mail Communication to Colonel Press Does Not Constitute a "Claim"

Kemron also emphasizes that it sought, via an electronic mail communication to Colonel Press on August 12, 2008, a "meeting to discuss the adverse CPAR." Opp'n 17; see also Compl. ¶ 43. This communication does not constitute a claim for purposes of the CDA. First, Kemron does not allege that Colonel Press was the contracting officer or his representative. See Compl. ¶ 43 (indicating that Colonel Press was the Corps' Omaha District Commander and District Engineer). Kemron also does not allege that Colonel Press was its primary contact with the Corps. See Neal & Co., 945 F.2d at 388-89 (determining that a claim was properly submitted to the contracting officer where the contractor delivered the claim requesting the contracting officer's final decision to its primary contact within the government agency). Second, Kemron simply requested "some time . . . to discuss" the initial CPAR with Colonel Press. Pl.'s Ex. 7 at A31. Such a request does not constitute a claim demanding something due or believed to be due. Furthermore, Colonel Press denied Kemron's request, see Compl. ¶ 43; Pl.'s Ex. 7 at A30, and Kemron does not allege that this denial constituted a final decision from the contracting officer. Cf. Compl. ¶ 49 (alleging that the issuance of the final CPAR constituted a final agency decision). Accordingly, Kemron's August 12, 2008 communication to Colonel Press cannot be construed as a claim for purposes of the CDA.

### 5.   Kemron's Communications With the Corps Following the Issuance of the Final CPAR Do Not Constitute "Claims"

Following the issuance of the final CPAR on January 20, 2009, Kemron "continued to voice its concerns and seek relief in the form of withdrawal or modification of the irrational CPAR." Compl. ¶ 47. Neither communication it cites constitutes a claim under the CDA because Kemron does not allege that these communications were directed to the contracting officer, his representative, or its primary contact with the Corps. Kemron's February 17, 2009 electronic mail communication was addressed to Mr. Petersen in his capacity as the assessing official. Compl. ¶ 47; see BLR Group of Am., Inc., 84 Fed. Cl. at 643 & n.13 (determining that an electronic mail request to the reviewing official was not a claim for the purposes of the CDA because "plaintiff does not allege, and the evidence does not suggest, that the . . . electronic mail message was submitted to the contracting officer, as required by 41 U.S.C. § 605(a)" and that "the absence of such an allegation provides an alternative basis for rejecting plaintiff's argument that its . . . electronic mail message constituted a CDA claim"). Similarly, Kemron's February 25, 2009 electronic mail communication was addressed to agency counsel. Compl. ¶ 48; Pl.'s Ex. 9 at A41.

### D.   Kemron Has Not Satisfied the Jurisdictional Requirements Under the CDA

The court's conclusion that Kemron did not submit a written claim to the contracting officer is supported by the February 25, 2009 electronic mail communication from Kemron's counsel to agency counsel. In that communication, Kemron stated that it "would be willing to

<u>submit a claim</u> at the agency level and work in good faith to resolve this issue amicably with the Contracting Officer . . . ." Pl.'s Ex. 9 at A41 (emphasis added). Thus, as of February 25, 2009, Kemron did not construe any of its prior communications to employees of the Corps as claims submitted to the contracting officer. If Kemron itself did not construe these communications as such, then none of those communications constituted a "clear and unequivocal statement that <u>gives the contracting officer adequate notice of the basis . . . of the claim.</u>" <u>Contract Cleaning Maint., Inc.</u>, 811 F.2d at 592 (emphasis added). Accordingly, Kemron's subsequent characterization of its communications during the course of this litigation does not transform these communications into claims for purposes of the CDA. <u>Executive Court Reporters, Inc.</u>, 29 Fed. Cl. at 774 n.7.

Furthermore, despite its numerous efforts to dialogue with employees of the Corps, Kemron has not alleged that it submitted a claim requesting a final decision from the contracting officer to its primary contact at the Corps. In <u>Neal & Co.</u>, the Federal Circuit determined that a claim was properly submitted to the contracting officer where the contractor delivered the claim "to its primary contact with a request for a final decision of <u>the contracting officer</u> . . . ." 945 F.2d at 388. Although 41 U.S.C. § 605 requires that claims be submitted to the contracting officer, the Federal Circuit explained that a contractor has a "reasonable expectation" that a request for a final decision of the contracting officer it sends to its primary contact with the government "will be honored . . . ." <u>Id.</u> Since the "primary contact in fact timely deliver[ed] the claim to the contracting officer," the Federal Circuit concluded that the contractor submitted a claim to the contracting officer in accordance with 41 U.S.C. § 605(a). <u>Id.</u> at 388-89. Consequently, the circumstances in <u>Neal & Co.</u> are distinguishable from those presented here and reinforce the court's conclusion that Kemron did not submit a valid written claim to the contracting officer.

The court's determination that Kemron did not submit a valid written claim to the contracting officer divests this court of jurisdiction over the complaint. <u>See</u> <u>James M. Ellett Constr. Co.</u>, 93 F.3d at 1541-42; <u>OK's Cascade Co.</u>, 87 Fed. Cl. at 745. In the absence of the submission of a written claim to the contracting officer, the agency can neither issue a final decision, 41 U.S.C. § 605(c)(3), nor fail to issue a final decision within the period required, thereby deeming the claim denied, <u>id.</u> § 605(c)(5). Since agency action is a jurisdictional prerequisite to proceeding before the Court of Federal Claims, <u>id.</u> § 609(a)(1); <u>Sharman Co.</u>, 2 F.3d at 1568, Kemron's failure to submit a valid written claim to which the Corps could respond requires the court to dismiss the complaint.

In the absence of a valid written claim that comports with the CDA's requirements, the court need not address the parties' jurisdictional arguments related to the court's ability to entertain claims for nonmonetary relief under the CDA.

## V.  CONCLUSION

For the reasons discussed above, defendant's motion to dismiss pursuant to RCFC 12(b)(1) is **GRANTED**.  The Clerk of Court is directed to **DISMISS WITHOUT PREJUDICE** the complaint and to enter judgment accordingly.  No costs.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge